FILED & JUDGMENT ENTERED
Steven T. Salata

Nov  24  2014

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## SHELBY DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **Case No. 11-40659** |
| **VICTORIA HARWELL GARDNER** | ) | **Chapter 12** |
| | ) | |
| Debtor. | ) | |

### ORDER DENYING DEBTOR'S MOTION TO MODIFY PLAN

**THIS MATTER** came before the Court on a motion by the Debtor, Victoria Harwell Gardner, to modify her confirmed plan under Code Section 1229 to afford her additional time to market and sell certain encumbered real estate. The Debtor maintains that the failure of the North Carolina General Assembly to renew historic tax credits potentially useful to her marketing effort constitutes an unanticipated, unforeseeable change in her circumstances that justifies modification.

Junior mortgage creditors Charles Lee Jones and Charles Jones Produce, LLC (collectively "Charles Jones") object. Charles Jones argues that modification is not warranted because the expiration of these state tax credits (1) was not a change in the Debtor's financial circumstances, but in law; (2) was reasonably foreseeable; and (3) was not substantial in that the Debtor has enjoyed the full marketing period provided for by the Plan before the tax credits expired. Further, Charles Jones maintains that the

1

proposed modification would unfairly overturn consensual decrees between the parties, including a North Carolina state court consent judgment between it and a nondebtor party.

An evidentiary hearing was held Friday, October 31, 2014.  The Debtor's attorney and non-filing spouse/codebtor, O. Max Gardner, III, ("Mr. Gardner") appeared for the Debtor; Kimberly A. Sheek appeared for secured creditor Ocwen Financial Corporation "Ocwen"); William A. Moore appeared for Charles Jones; and Steven G. Tate appeared as the Chapter 12 trustee.

### Findings of Fact

This dispute turns on the marketing of a historic property known as Webbley and the three lots that surround it (collectively the "Shelby Property).  Constructed in 1852, Webbley is the former home of North Carolina governor, O. Max Gardner.  The residence is listed on the National Register of Historic Places.  The Debtor and Mr. Gardner (collectively the "Gardners") purchased Webbley in 1989 and subsequently restored the residence.  During the twenty five years that the Gardners' have owned Webbley, it has been variously used as a residence, law office and an upscale bed and breakfast inn.

As of  October 18, 2011, the date that the Debtor filed this bankruptcy case,  the Shelby Property and/or the Gardners' other jointly owned properties, including their residence  (collectively the "Casar Property"), served as collateral for debts owed to Ocwen, First National Bank of Shelby, George and Rhonda Malkamus, and Charles Jones.  Additionally, the jointly held properties were then and remain encumbered by a federal tax lien. Charles Jones is the junior priority lien holder on both the Shelby

Property and the Casar Property to secure his debt of, at that time, some $537,000. At the bankruptcy date, all of the Gardners' properties were in foreclosure proceedings initiated by Ocwen or Charles Jones or both. The Chapter 12 filing stayed these actions.

On December 27, 2011, the Debtor filed a Chapter 12 plan that proposed to retire secured debts such as Charles Jones' by selling the Shelby lots, and if necessary, Webbley. The Debtor's proposed plan allowed her to retain the residence jointly owned by she and Mr. Gardner. The plan further requested a special injunction in favor of Mr. Gardner, a nondebtor, protecting him from all non-bankruptcy claims including collection actions. Secured creditors Ocwen and First National (Bank of Ozarks) objected to confirmation for reasons including the lack of a marketing deadline or sale period. The Debtor countered by seeking to disallow the secured claims of these and other secured creditors. In time, the parties reached a settlement, and the Debtor's proposed plan was amended. *See* First Amended Chapter 12 Bankruptcy Plan And Motion To Approve Settlements With Ocwen Loan Servicing, LLC And Deutsche Bank Trust Company Americas dated May 14, 2012 ("Amended Plan").

The primary components of this first settlement were as follows: (i) a consensual write down of senior mortgage holder Ocwen's secured debts; (ii) the Gardner's agreement to put all of the Shelby property up for sale (including Webbley); and (iii) a marketing deadline containing a "drop dead" provision. As to the marketing and sale deadline, the Amended Plan provided:

> If the debtor does not secure a binding offer or offers to purchase the Shelby Property within 27 months of the date of confirmation of the First Amended Plan, then First National Bank and Jones shall be granted immediate relief from the automatic stay without further notice or hearing to do one or more of the following:

A.  To purchase the claim of Ocwen secured by the Shelby Property and the claim of the IRS secured by a lien on the Shelby Property and the right-of-way for the Casar Property or any other claim secured by a lien on the Shelby Property and to proceed with a state foreclosure proceeding if such party elects to do so, provided, however, that a notice of assignment of such claim must be filed with the Court;

B.  To purchase the property from the estate for the amount owed at the time of purchase on all of the claims secured by the Shelby Property plus the amount owed at that time on the Malkamus claim;

C.  To proceed with a foreclosure on the Shelby Property subject to any senior or junior liens in accordance with applicable North Carolina law; or

D.  To file an election with the Debtor, the Chapter 12 Trustee, all parties in interest and with the Court to continue to receive the adequate protection payments provided for under this First Amended Plan so as to permit the Debtor to continue in her efforts to market the Shelby Property. Any election under this Section may be terminated upon sixty (60) days notice to the Court, the Debtor, the Chapter 12 Trustee and all parties in interest.

In short, it was agreed that if the Shelby Property was not sold within twenty-seven months, Charles Jones and First National would have immediate relief from stay to pursue their remedies against the Shelby Property, including foreclosure.

Although the Amended Plan was stated to be a settlement with Ocwen/Deutsche, by the time of the confirmation hearing, other secured creditors, including Charles Jones had become heavily involved.  Thus, at the joint confirmation and settlement hearing held on May 25, 2012, final changes to the proposed Amended Plan and Settlement were announced on the record and then memorialized in a Confirmation Order dated June 11, 2012.  The Confirmation Order expressly stated that all confirmation related disputes between the Debtor and secured creditors Ocwen, First National, Malkamus, and Charles

Jones were settled. The Amended Plan as further modified and approved by the Confirmation Order will be hereinafter termed "the Confirmed Plan." Among other agreed changes made to the Amended Plan, the Debtor's proposed "special injunction" restraining collection actions against Mr. Gardner was withdrawn. *See* Amended Plan, Section C Confirmation Order, Findings of Fact ¶ 8, and Confirmation Order ¶ 8.

Charles Jones quickly acted on this concession. Before becoming a lender to the Gardners, Jones was a client of Mr. Gardner's legal practice. Nine days after confirmation, Jones sued Mr. Gardner in Superior Court, Gaston County, generally asserting that Mr. Gardner had improperly induced him to make this loan. Civil Action No. 12-CVS-2500 (the "State Court Action"). The State Court Action sought not just a recovery on the underlying loan debt, but also asserted tort claims against Mr. Gardner based on the fiduciary duties owed in an attorney-client relationship. The Debtor immediately removed the State Court Action to bankruptcy court (where it was recast as Adv. No. 12-04035) and filed her own suit against Charles Jones and his attorneys. She accused them of violating the Confirmed Plan and of various other wrongs (Adv. No. 12-04034).

This latest dustup precipitated a second round of negotiations between these parties before mediator and retired Superior Court Judge Forest Ferrell. The mediation effort was successful, and on October 23, 2012, the parties entered into a "Memorandum of Mediated Settlement" resolving their disputes.

After notice, this mediated settlement was approved by a Consent Order dated October 30, 2012 entered in the two adversary proceedings (the "Consent Order"). Under its terms, the parties agreed that the State Court Action would be remanded to

Superior Court, Gaston County, for entry of a Consent Judgment against the Gardners in favor of Charles Jones for $631,300.12.  Execution on that Consent Judgment would be stayed for so long as payments were made to Charles Jones as outlined in the aforementioned Confirmation Order or until sufficient real property was sold to satisfy the judgment, whichever came first.  It was further agreed that should Mr. Gardner file bankruptcy, this obligation to Charles Jones would be a non-dischargeable debt.  The Debtor's Adversary proceeding and all other claims between the parties to the two actions were dismissed with prejudice.  It was stipulated that the settlement did not affect the secured status of Charles Jones in the bankruptcy case and that the Confirmed Plan remained in full force and effect.  The State Action (Adv. 12-4035) against Mr. Gardner was remanded and the aforementioned Consent Judgment was entered in Superior Court, Gaston County, on December 10, 2012 (the "State Consent Judgment").

Upon confirmation, the Gardners listed the Shelby Property for sale. Unfortunately, the property failed to sell.  At the end of the twenty-seven month sale period, the Gardners' had received little interest in the property and no written offers. While the Debtor testified that she received two informal, verbal offers in the latter months of the sale period, neither was for more than $1,000,000, or sufficient to retire the secured debts on the Shelby Property.

Now, having failed to sell the property within the agreed period, the Debtor seeks to modify the Confirmed Plan to extend, or more accurately, renew, the marketing period. The Modification motion asks that she be permitted until May, 2016 to obtain a buyer, an additional 18 months past the deadline in the Confirmed Plan.  At the hearing, the Debtor reduced the requested extension period to end in August, 2015, approximately 12 months

beyond the September 11, 2014 deadline.

## Discussion

The Debtor contends that the only issue that need be decided in order to grant her request is whether sufficient unforeseen changes in her circumstances exist to support plan modification under Section 1229.  Clearly, the matter is more complicated than that. The Confirmed Plan is based upon carefully crafted settlements between the Gardners and several different parties, including Charles Jones, Ocwen, Deutsche Bank, First National, and the Chapter 12 Trustee.  In that document, the parties agreed that should the Debtor fail to sell the Shelby Property, or at least have it under contract, by September 11, 2014, Charles Jones and First National would be permitted to pursue a variety of collection remedies, including foreclosure, against the Shelby Property.  The subsequent Consent Order and the state Consent Judgment against the Gardners also adopted this feature of the Confirmed Plan.  None of the aforementioned consensual decrees provide for an extension of the marketing period.

To be clear, the Debtor's filing of the current Motion did not stay the "drop dead" provision of the Confirmed Plan.  Thus, since September 11, Charles Jones and First National have been at liberty to pursue their stipulated remedies against the Shelby Property.  Although the issue is not currently before this Court, depending on how one reads the Consent Judgment, Charles Jones may also have the present right to seek recovery against Mr. Gardner.

This illustrates one of several hidden complications of this matter.  Here, the Debtor seeks not just to modify a confirmed plan, but to (a) grant relief from several consent decrees (Confirmed Plan, Consent Order, and Consent Judgment) over the

objection of one of the other parties (Charles Jones), (b) impose injunctive relieve similar to the Section 362 automatic stay as to the Shelby Properties, and potentially (c) to impose a bankruptcy court injunction restraining Charles Jones from exercising its rights against Mr. Gardner under the state court's Consent Judgment.  This is indeed a tall order.

### A. <u>Modification of the Confirmed Plan is Not Warranted</u> .

Turning first to the Debtor's motion to modify her plan, 11 U.S.C. § 1229 provides in pertinent part:

> (a) At any time after confirmation of the plan but before the completion of payments under such plan, the plan may be modified, on request of the debtor, the trustee, or the holder of an allowed unsecured claim, to—
>
> (1) increase or reduce the amount of payments on claims of a particular class provided for by the plan;
>
> (2) extend or reduce the time for such payments; or
>
> (3) alter the amount of the distribution to a creditor whose claim is provided for by the plan to the extent necessary to take account of any payment of such claim other than under the plan.

Section 1129 is comparable to Section 1329, and thus cases filed under Chapter 13 are of use in this inquiry.  8 COLLIER ON BANKRUPTCY ¶ 1229.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).   Under controlling Section 1329 case precedent, a proposed modification must fall within one of the enumerated subparts; else, modification cannot be allowed.  *Murphy v. O'Donnell (In re Murphy)*, 474 F.3d 143, 150 (4th Cir. 2007); *see also In re Sandford*, 498 B.R. 307, 311(Bankr. D.N.M. 2013).

Charles Jones first argues that the requested modification falls outside of the three statutory subparts and cannot be allowed.   Under the facts presented, this Court thinks

otherwise.   Per the Confirmed Plan, the first and best mechanism of paying secured creditors like Charles Jones was through the sale of the Shelby Property.   Extending the marketing period is but a means to effect payment.   In essence, the proposed modification affects the timing of payments under the plan.   Section § 1229(a)(2) would thus appear sufficiently broad to accommodate an extension of the sale period assuming the other criteria are met.

The doctrine of res judicata prevents modification of a plan "unless the party seeking modification demonstrates that the debtor experienced a 'substantial' and 'unanticipated' postconfirmation change in his financial condition." *Murphy*, 474 F.3d at 149.   "A change is unanticipated if the debtor's present financial condition could not have been reasonably anticipated at the time the plan was confirmed." *Id*. (citation omitted).

"When a debtor modifies a confirmed Chapter 12 plan under § 1229, the debtor has the burden of proving that the modifications meet the confirmation requirements." *In re Hart*, 90 B.R. 150, 154 (Bankr. E.D.N.C. 1988).   The debtor must also "show that there is a 'probability of actual performance of provisions of the plan.'" *Id*. (citation omitted).   "The extent and detail of the evidence required to prove feasibility depends upon the circumstances of each case." *Id*.   The level of proof required often turns on whether all parties consent to the proposed modification.   "If a modification is contested by creditors who will be harmed if the plan does not work, the degree of proof required to demonstrate feasibility will be higher than if there is no objection to the modification." *Id*.

The Debtor argues that the expiration of North Carolina's Historic Rehabilitation

Tax Credits, N.C.G.S. §§ 105-129.35 through -129.39, constitutes a substantial and unanticipated post-confirmation change in circumstances. Section 105-129.35(a) of the North Carolina General Statutes provides that "[a] taxpayer who is allowed a federal income tax credit under section 47 of the Code for making qualified rehabilitation expenditures for a certified historic structure located in this State is allowed a credit equal to twenty percent (20%) of the expenditures that qualify for the federal credit." The tax credits "expire[ ] for qualified rehabilitation expenditures and rehabilitation expenses incurred on or after January 1, 2015." *Id.* § 105-129.39.

The Debtor asserts that the North Carolina General Assembly's decision not to extend the tax credits beyond January 2015 after renewing the credits annually for many years impaired her ability to sell the Shelby Property, necessitating plan modification. In support of her contention, at the hearing the Debtor testified as to the condition of Webbley when the Gardners purchased it, of renovations made, and of their previous use of tax credits to pay for such expenses. According to Debtor, the home requires continuous maintenance and preservation.

The Debtor further testified that she operated Webbley as an upscale bed and breakfast inn for several years during which time the inn garnered a ranking of four out of five stars. Relying on an appraisal ordered by Charles Jones, the Debtor asserted that the highest and best use of Webbley was as an upscale bed and breakfast.[1] According to the Debtor, for Webbley to gain a five star ranking, a potential buyer would need to update the bathrooms and add individual temperature controls for each room. The Debtor then asserted that tax credits would be necessary to complete these improvements and

---

[1] The actual appraisal was not introduced into evidence.

[2] Although not all courts agree, a bankruptcy court may act under § 105(a) to impose

necessary for a sale.  She observed that obtaining such tax credits was quite an onerous and several month long process that requires detailed documentation, adherence to strict historic guidelines, and government site visits.

For Section 1229 purposes, the change the Debtor cites as reason for modification is, in fact, probably not even a change in the Debtor's financial circumstances at all.  But, even if it were, the change is neither substantial nor unforeseeable.

A change in circumstances within the meaning of the statute typically involves changes in the debtor's financial condition such as an increase or decrease in income. For example, the controlling case in this Circuit, *In re Arnold*, involved a 150% increase in the debtor's salary during the plan period.  869 F.2d 240, 242 (4th Cir. 1989).  That income change was ruled to be a qualifying, significant change in the debtor's financial circumstances.  *Id*.

Here, however, the cited change is not personal to the Debtor.  Rather, it is the expiration of a state statute per the statute's own terms.  A self-expiring statute running its course is arguably not a change in law at all.  Even so, a change in law is not a change in circumstances for the purposes of a modification of a bankruptcy plan.  *See In re Kuhasz*, 2008 WL 5539788, at *4 (Bankr. D. Kan. Nov. 19, 2008) ("A post-confirmation change in applicable bankruptcy law is not sufficient to warrant a revocation or modification of the terms of a confirmed and operating Chapter 13 plan.").

That point aside, it is clear that any change was not substantial, at least as to performance under the Confirmed Plan.  The Legislature's decision not to renew the Historical Tax Credits was not made until the twenty-seventh month of the Debtor's twenty-seven month marketing period.  In her Motion, the Debtor states that she first

became aware of the change on August 22, 2014.  Debtor's Motion, at ¶12, ¶19.  The deadline to sell the Shelby Property was September 11, 2014.  *Id*. at ¶ 7.  In short, the Debtor had over 2 years to find a buyer for Webbley, failed, and now claims that a future change in tax law announced a mere twenty days before the sale deadline is a substantial change in condition prohibiting the sale.  Because a future change in tax treatment was announced so late in the sales period, this Court cannot find that the change actually affected the implementation of the plan as confirmed.

This point is reinforced by the fact that the credits themselves remained in effect for the full twenty-seven month period.  The tax credits do not "sunset" until January 1, 2015.  N.C.G.S. § 105-129.39.  Put differently, the asserted "change in law" does not occur until three months after the sale period ends.  The prospective discontinuation of the tax credits cannot be seen as a change in fact or in the Debtor's circumstances during the specific sales period.

Of further note, based on the parties' prior conduct, it does not appear that the existence of the tax credits was material to a sale.  These credits existed at the time the first proposed Plan, the Amended Plan, the Confirmed Plan, the Consent Order, and the Consent Judgment were negotiated.  The credits were always subject to expiration at the end of a particular calendar year if not renewed by the Legislature.  Had the Gardners believed that the tax credits were an integral part of their sales effort, doubtless they would have included language to that effect in these agreements.  However, no mention of the tax credits appears in any of these documents.

Finally, the evidence presented fails to establish that the tax credits were in any way necessary to market or sell Webbley.  While apparently an appraisal concludes that

the property's highest and best use is an upscale bed and breakfast, the Debtor leaps to the conclusion that it must only be sold as such. The Debtor asserts that significant renovations are necessary for a buyer to operate the inn in that fashion. One wonders why, given that the Debtor previously operated Webbley as ostensibly one of the best and highest ranked bed and breakfast inns in the United States without such renovations. She also implied that a buyer could only make those renovations with tax credit assistance.

The evidence presented simply does not support such conclusions. The only testimony that could be interpreted to support the Debtor's theory were two excluded, hearsay statements related to verbal offers on Webbley. These purported to condition the two potential buyers' willingness to make an offer on receiving assurances that the tax credits would in fact be available to complete upgrades to operate the property as a bed and breakfast inn. Apart from being hearsay, these assertions do not support the premise that the tax credits are necessary for the property to be sold at its highest and best use. Since the tax credits expire annually if not renewed by the Legislature, no one during the original marketing period or even during the proposed longer period could make the assurances allegedly demanded. Second, the two alleged "offers" were not written, meaning they are not enforceable under North Carolina law. 1 Patrick K. Hetrick & James B. McLaughlin, Jr., WEBSTER'S REAL ESTATE LAW IN NORTH CAROLINA § 9.06 (6th ed. Nov. 2013). They are just "talk." Finally, even if offers, the verbal statements offered a price too low to support a sale. *See* Section B, below.

And even if these other problems did not exist, the expiration of the tax credits is not a change that "could not have been reasonably anticipated at the time the plan was confirmed." *Murphy*, 474 F.3d at 149 (citation omitted). The difficulty in selling a home

of this stature and cost along with the possibility that the tax credits would sunset was certainly foreseeable at the time of confirmation. Indeed, all parties were on notice at the time of confirmation that the credits were to sunset annually unless extended, as the expiration date was explicitly included in the text of the statute. N.C.G.S. § 105-129.39. Thus, no unanticipated and substantial change of the Debtor's financial circumstances has occurred since confirmation on account of the tax credits.

**B.** **Reinstating the Automatic Stay, Reconsidering Prior Consent Decrees, and Affording Injunctive Relied is Also Not Warranted** .

To be abundantly clear, even if granted, the Debtor's motion to modify would have no practical effect on staying the relief previously afforded to Charles Jones in the Confirmed Plan. By its terms, Charles Jones and First National Bank have had automatic relief from stay since September 12, 2014. To afford the Debtor a further marketing period, this court would have to constrain Charles Jones' rights against the Shelby Property under both the Confirmed Plan and the Consent Order, effectively re-imposing the § 362 automatic stay.[2] Then, this Court would have to enjoin operation of the state court consent judgment as against Mr. Gardner. In addition to modification, relief from two or three negotiated settlements would be required.

---

[2] Although not all courts agree, a bankruptcy court may act under § 105(a) to impose protections analogous to those afforded by the automatic stay, 11 U.S.C. § 362, even after the stay has terminated. *See Grundy Nat'l Bank v. Looney (In re Looney)*, 823 F.2d 788, 792-93 (4th Cir. 1987) ("Several courts have allowed, by reference to § 105(a) powers, the reinstatement of automatic stays that had terminated." (citing, *inter alia*, *Explorer Drilling Co., Inc. v. Martin Exploration Co. (In re Martin Exploration Co.)*, 731 F.2d 1210, 1214 (5th Cir. 1984)); *In re Whitaker*, 341 B.R. 336, 346-47 (Bankr. S.D. Ga. 2006) ("The powers conferred by § 105(a) are unambiguously broad. Courts elsewhere have held that the statute grants authority to reimpose the stay if the court has lifted the stay under § 362(d) or after the stay has lapsed by operation of law—typically by § 362(e)." (citations omitted)).

As for the consent orders entered in the bankruptcy case, a court has the power to modify a consent order in certain circumstances. *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992) ("Modification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous."). However, this is a power that must be exercised cautiously. "[A] party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Id.* at 383. As previously discussed, no significant change in circumstance has occurred in this case.

Similarly, Rule 60(b)(5) provides "the court may relieve a party or its legal representative from a final judgment, order, or proceeding . . . [if] applying it prospectively is no longer equitable." However, even if applying this slightly less burdensome alternate standard under Federal Rule of Civil Procedure 60(b)(5), relief from these consent decrees remains unwarranted on these facts.

Here, the balance of the equities tilts sharply in favor of Charles Jones and against the Gardners. On two separate occasions, these parties engaged in extensive negotiations. In the first, as a part of a multiparty settlement, the Confirmed Plan, the parties resolved their differences and provided the Gardners with a two plus year window in which to sell the Shelby Property. Then, after Charles Jones sought to liquidate his claims against Mr. Gardner, a nondebtor not protected by the bankruptcy stay or any plan injunction, further agreements were made in mediation before a highly regarded, capable mediator. Once again, the result was a well-thought-out, detailed settlement manifested in a Consent Order in this bankruptcy court and a Consent Judgment in the state court.

Under the terms of the parties' consent decrees, Charles Jones, the junior

mortgage holder on the Shelby Property and thus the secured creditor most likely to be harmed, agreed to wait for over two years while the Gardners marketed and enjoyed the use of the property.  Likewise, per the Consent Order and Consent Judgment, Charles Jones surrendered his state law claims against a nondebtor in exchange for the promises made by the Gardners.

Charles Jones fully performed under those agreements and gave the Gardners the time requested to sell the Shelby Property.  It is now Charles Jones' time to enjoy the benefits and rights under the same.  Instead, this proposed marketing modification would prolong Charles Jones' wait giving the Gardners a further benefit not contemplated in the original bargain.

In addition to depriving Charles Jones of the benefits due under these bargains, the Gardners request may well put Charles Jones at significant financial risk.  The Debtor's motion presents murky issues of collateral values and adequate protection. Although the parties did not introduce the present values of the collateral properties versus the balances of the current claims, the Amended Plan illustrates a potentially serious problem.  The secured claim balances stated in that 2012 document are as follows:

| Secured Claims | Shelby Property | | Casar Property | |
|---|---|---|---|---|
| Ocwen | 1st | $ 450,000 | 1st | $525,000 |
| First National | 2d | 122,762.74 | | --- |
| IRS | 3d | 41,380.15 | 2d | same[3] |
| Malkamus | | ---- | 3d | 316,249.92 |
| Charles Jones | 4th | $ 537,009.42 | 4th | same |

---

[3]  Because the Confirmed Plan contemplates selling the Shelby Property and using it to retire all of the secured claims, including Malkamus, other than the Ocwen debt on Casar, we focus first on the Shelby property values and debts.

| | | |
|---|---|---|
| **Principal balances, as of 5/14/12**[4] | $1,151,152.31 | $841,249.92 |

Meanwhile, the Debtor valued the Shelby Property at $3,650,000 and Casar at $3,092,500. If these values were accurate, there would be overall equity to protect each of the secured creditors during an extended marketing period. However, we now know that the Shelby Property was not accurately valued in the Amended Plan.[5] Instead of a value of $3,650,000, at this latest hearing the Debtor relied on a value of $1.6 million calculated in an earlier appraisal obtained by Charles Jones. Worse, after two plus years of marketing the Shelby Property, the Gardners have yet to receive an offer, or even any interest for that matter, at prices beyond $1.0 million. At best, less than half of Charles Jones' debt is supported by the Shelby Property.[6]

Of course, creditors IRS, First National and Charles Jones also have junior liens on the Casar Property, so they would have recourse to those properties to cover their shortfall. However, according to the Amended Plan, there is at least $841,000 of senior debt on these properties. If the Casar Property is overvalued like the Shelby Property,

---

[4] These balances are only rough estimates based on two year old balances. Interest, of course, continued to accrue on these debts, and this would increase the balances. On the other hand, the Confirmed Plan contemplated adequate protection payments to the lenders, and direct payments to Ocwen. A precise current payoff is not calculable on this record.

[5] The Confirmation Order, ¶ 8, stipulated that the Debtor's plan values were not binding on Charles Jones in future proceedings.

[6] Per the Consent Judgment, the parties agreed Charles Jones was owed $631,300.12, not the $537,000 stated in the Confirmed Plan. At the hearing, the parties seemed to assume that the Shelby Property would have to sell for as much as $1.3 million to clear liens on the Shelby Property (without any retirement of the Malkamus debt).

there may well be no realizable equity for junior lienholders in it either.[7]

As the junior lien holder on both groups of properties, Charles Jones stands to lose the most by the Gardners' continued speculation on Shelby Property's saleability.[8] While the record is insufficient to make adequate protection findings under the Code, the potential that the additional delay could be "paid for" by Charles Jones weighs the equities in Jones' favor.

Finally, there has been no record or request made to the Court for injunctive relief.    Procedural barriers aside,[9] the aforementioned principles of equity preclude granting injunctive relief to restrain Charles Jones from acting against the Shelby Property collateral.

And, even if this bankruptcy court were inclined to entertain injunctive relief in favor of the Debtor, to the extent that the failure to sell the Shelby Property in due time constitutes a default under the Consent Judgment,[10] the Debtor's husband is a non-filing third-party.    Affording a non-debtor injunctive relief is an extraordinary remedy in bankruptcy and one that is generally disfavored.  By example, in the analogous instance

---

[7]We also do not have any estimation of current ad valorum taxes, realtors' commissions, closing costs, etc. that would further consume sale proceeds if the two groups of properties had to be sold to retire secured debt.

[8] Ocwen, the senior secured creditor, made concessions at the hearing on this matter that would permit modest payments to junior lienholders and in theory provide additional adequate protection to Charles Jones.  However, those payments would be, at best, neutral to Charles Jones as the debt owed to the senior secured creditors would continue to accrue and result in a lower payout to junior liens upon sale of the Debtor's properties.

[9] Bankruptcy Rule 7001 requires injunctive relief be sought by adversary proceeding. This matter was brought as a motion in the Debtor's bankruptcy case.

[10] This is a question for another day and probably one for the State Court as it involves rights between two nondebtor parties.

of a debtor request to provide non-debtor releases to third-parties under Chapter 11 plans, the Fourth Circuit has recently warned these "should only be approved 'cautiously and infrequently.'" *Nat'l Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344, 347 (4th Cir. 2014) (explaining that a court must consider six factors when weighing whether to approve a non-debtor release: "(1) There is an identity of interests between the debtor and the third party . . . ; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization . . . ; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; [and] (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full." (citation omitted; alteration in original)).

In sum, this Court is appreciative of the personal significance of the Shelby Property to the Debtor and Mr. Gardner. This Court is also sympathetic to the "spot" in which they find themselves. It is regrettable. However, in large measure, it is by their past agreements that they find themselves in these unpleasant circumstances, and it is by these agreements that the parties' future course must be determined. In short, we must live by the deals we make. Consequently, the Debtor's motion to modify must be DENIED.

**SO ORDERED.**

**This Order has been signed electronically.**          **United States Bankruptcy Court**
**The judge's signature and the court's seal**
**appear at the top of the Order.**